JEANNE M. GILLIES,

          **Plaintiff,**

-vs-                             **Case No.  6:09-cv-907-Orl-31KRS**

COMMISSIONER OF SOCIAL
SECURITY,

          **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This cause came on for consideration without oral argument on the Complaint filed by Plaintiff Jeanne M. Gillies, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 10, 12.

## I.      PROCEDURAL HISTORY.

      In April 2006, Gillies applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act).  R. 134-41.  She alleged that she became disabled on February 1, 2001.  R. 134, 139.  Gillies' applications were denied initially and on reconsideration.  R. 84-97.

Gillies requested a hearing before an administrative law judge (ALJ). R. 107. An ALJ held a hearing on September 18, 2008. Gillies, who was represented by an attorney, testified at the hearing. Susanna Roche, a vocational expert (VE), also testified. R. 35-82.

After considering the testimony and the medical evidence presented, the ALJ determined that Gillies had not engaged in substantial gainful activity since February 1, 2001, the alleged onset date of her disability. R. 28. The ALJ found that she was insured under OASDI through June 30, 2007. R. 26.

The ALJ concluded that the medical evidence showed that Gillies had the following severe impairments: (1) a major depressive disorder; (2) bulimia; and (3) a panic disorder. R. 28. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1] R. 29.

The ALJ found that Gillies had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional mental limitations: simple, routine, and repetitive one-two step tasks; a work environment free of fast-paced production requirements; work involving only simple work related one-two step decisions; few, if any work place changes; isolated work with occasional supervision; and occasional interaction with co-workers. R. 30.

In reaching this conclusion, the ALJ gave great weight to the opinions of reviewing psychologists Dr. Carter and Dr. Green that Gillies had moderate mental limitations, finding

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

that their opinions were consistent with the opinions of Dr. Buhrmann and Dr. Abraham, both of whom treated Gillies. R. 32-33. The ALJ found the opinion of Dr. Buhrmann to be "somewhat persuasive." R. 32. The ALJ also found that Gillies' testimony concerning the intensity, persistence, and limiting effects of her symptoms was not totally credible. R. 31.

The ALJ found that Gillies was unable to perform any past relevant work, which exceeded the demands of her RFC. R. 32. Relying on the testimony of the VE, the ALJ found that Gillies could perform work as folder clerk or golf range attendant, which existed in significant numbers in the national economy. R. 33. Therefore, the ALJ concluded that Gillies was not disabled. *Id.*

Gillies requested review of the ALJ's decision and submitted additional evidence for consideration. R. 6, 8-9. On April 23, 2009, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 1-3. Gillies timely sought review of this decision by this Court. Doc. No. 1. Thereafter, the parties filed memoranda of law in support of their positions. Doc. Nos. 13, 16. The case has been referred to me for issuance of a Report and Recommendation.

## II.    JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of

disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even

if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Servs*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## IV. STATEMENT OF FACTS.

### A. Gillies' Testimony and Written Statements.

Gillies was born in 1968. R. 42. She attended school through the tenth grade. She subsequently earned her GED and obtained a cosmetology license. R. 44, 182.

Gillies previously worked as a retail store manager and a waitress. R. 47-48, 51, 235. She stopped working in 2001, when she was accused of murder and placed on house arrest for three years. R. 54. Thereafter, she worked sporadically. She had not worked since 2006. R. 47-48, 255; *see also* R. 28 (ALJ found that Gillies had not engaged in substantial gainful activity since February 1, 2001) .

Gillies testified that she had constant anxiety and mood swings.  R. 58, 68.  She had anxiety attacks off and on throughout each day.  R. 184.  She experienced dizziness, lightheadedness, shortness of breath, tingling, and nervousness.  R. 185.  She had problems with her memory and understanding things sometimes, but she did not know why.  R. 69.  She also had trouble concentrating and following instructions.  R. 101-02, 192.  Her anxiety got worse after her trial.  R. 58-59, 184.  She felt very angry and bitter.  R. 57.  She cut her arms and felt as though she could kill herself when she found out she was denied social security disability benefits in September 2006.  R. 206.  She took Prozac, Depakote, Xanax, and Abilify.  R. 58, 67.  The medications helped her "to a point."  R. 58.  She did not go to therapy because she could not afford it.  R. 59-60.

Gillies lived in an apartment with a roommate.  R. 41-42.  She had a 21-year-old daughter who lived with her boyfriend.  R. 42.  She had several pets.  R. 43.  She testified that she spent 90% of her life at home in her pajamas.  R. 43, 178.  She had a hard time leaving her apartment.  R. 70, 178, 206.  She stated, "it's not like I can't leave the house but sometimes I feel like I can't leave the house at all."  R. 55.  Gillies also testified that she could not handle being around people and did not like people in general.  R. 55.  She was afraid of people.  R. 56.  She said, "[i]t's not like I can't be around people.  I'd just rather not."  R. 63.  She testified that if she had to work with more than two or three people, "[e]ventually I would snap. . . . I start to freak out."  R. 69. [2]

---

[2] Gillies testified that she was nervous at the hearing.  R. 45.  From time to time, she strayed from the ALJ's line of questioning – such as to ask if she had mascara on her face, R. 66, whether she was speaking too loudly, R. 50, and to tell the ALJ that she wanted a necklace someone was wearing, R. 80.

Gillies visited her daughter at her home. R. 56. Sometimes she took her dog out, but her roommate walked the dog most of the time. R. 43. She went grocery shopping about once a week. R. 43, 55, 190. She went to the library and used the computer. R. 62-63. She usually went when the library was not busy and, if there were people there, she would put on headphones and tune people out. R. 63. She shoplifted groceries when she did not have enough food. R. 64-65.

On an average day, Gillies would wake up and make tea, do some reading and exercise, go online, talk on the phone with her mother and best friend, shower, drink a lot of tea "because I'm afraid," try to remain calm, and hold her dog. R. 187, 191. She prepared her own meals including salads, sandwiches, and frozen dinners. R. 189. She sometimes did laundry and cleaned. *Id.* She was able to pay bills, count change, and use a checkbook, R. 190, but her roommate wrote that Gillies did not have sufficient self-discipline to keep track of her accounts, R. 215.

Gillies' roommate confirmed Gillies' testimony about her limitations and daily living activities. R. 195-96, 212-19. He indicated that he witnessed Gillies have up to six anxiety attacks in one day, each one lasting about thirty minutes. R. 195. She spent most of her time watching television, using the computer, and eating. She usually stayed home and only went out when necessary. R. 212. She spent days at a time locked in her room. R. 218. She went outside about three times per week. She went grocery shopping about twice a week. R. 215.

B.      *Medical Records.*

On March 1, 2005, Gillies went to Health Care Connection, P.C., in the Virgin Islands. She reported a history of bulimia and panic attacks. She also reported a history of depression (MDE) "all my life." R. 264. She relayed that she had been off Prozac for three months and had run out of Xanax. Scott Hartshorn, M.D., prescribed medication, including Prozac, Wellbutrin, and Xanax. R. 264-65. On March 17, 2005, he prescribed Ativan for insomnia. R. 265.

Gillies followed up with Dr. Hartshorn on March 29, 2005. She reported that Xanax "works well" but that she still had insomnia. Dr. Hartshorn noted that Gillies' mood was good. He prescribed Trazadone for insomnia. R. 263-65.

On May 3, 2005, Gillies returned to Dr. Hartshorn. She reported that she was sleeping better but had heavy anxiety. She reported her energy level as "OK." R. 262. Dr. Hartshorn noted Gillies' mood was appropriate. He continued to treat her with medication. On January 20, 2006, Dr. Hartshorn noted that Gillies was in Orlando and did not have any medication, and would follow up with a new doctor. *Id.*

On May 5, 2006, Gillies underwent a psychodiagnostic examination by Linda Yankovic, ARNP, at Lakeside Behavioral Healthcare outpatient medical clinic. Her chief complaint was "'I need to stay on my medication.'" R. 270. Gillies reported that she had run out of Xanax and Ambien a week ago. She was still taking Prozac and Wellbutrin and wanted to continue those medications. *Id.*

Gillies complained of depression "even on the medications." R. 271. She felt helpless and hopeless. She complained of a decrease in energy, sleep, and appetite. She reported she suffered from bulimia and purged several times a week.

Upon examination, ARNP Yankovic noted that Gillies' affect was blunted. Her thought processes were coherent, logical, and organized. She denied any suicidal or homicidal ideation, or history of suicide attempts. She denied auditory or visual hallucinations, paranoia, or grandiosity. Her memory was intact for remote and recent events. Her insight, judgment, and impulse control were fair. She reported having difficulty with concentration. *Id.*

Yankovic diagnosed Gillies with depressive disorder not otherwise specified (NOS), rule out post traumatic stress disorder, and bulimia nervosa. Yankovic assigned Gillies a global assessment of functioning (GAF) score of 50.[3] She continued Gillies on Prozac and Wellbutrin, and prescribed Atarax for anxiety and Benadryl for insomnia. She referred Gillies to outpatient therapy. R. 272.

On July 6, 2006, Gillies underwent an outpatient psychiatric evaluation by Joy Abraham, M.D. Gillies' chief complaints were bulimia, anxiety attacks, and depression. She reported having suffered from anxiety and depression for many years, and that the symptoms started when she was twelve years old. She had a fear of public places and had

--------

[3] The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). Harold I. Kaplan, M.D., & Benjamin J. Sadock, M.D., *Synopsis of Psychiatry* 299 (8th ed. 1998) (hereinafter *Synopsis of Psychiatry*). A GAF score between 41 and 50 is defined as: "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg, no friends, unable to keep a job)." *Id.*

a difficult time leaving home for many years.  She cut her forearm twice two years ago.  She had panic attacks.  She avoided social situations.  She induced vomiting at least twice per week.  She often felt helpless, hopeless, and insecure.  She thought she was going crazy at times.  She had significant insomnia.  R. 304.

Upon examination, Dr. Abraham noted that Gillies' affect was appropriate, and her mood was extremely apprehensive and anxious.  She was depressed.  Her speech was logical, coherent, and goal directed.  She had no formal thought disorders, delusions, hallucinations, obsessions, compulsions, suicidal or homicidal ideations, preoccupations, or intrusive thoughts.  Gillies' memory was intact.  Her attention and concentration were good.  She had good insight, intact judgment, and abstract thinking.  R. 305.

Dr. Abraham diagnosed Gillies with panic disorder with agoraphobia, recurrent major depression, bulimia nervosa, and borderline personality disorder.  She assigned a GAF score of 55.[4]  Dr. Abraham's prognosis was "[g]uarded because of the extremely abnormal personality structure."  R. 306.  She prescribed Effexor and Klonopin, and referred Gillies to Dr. Beena Parikh for psychotherapy.  R. 302, 306.

Gillies returned to Dr. Abraham on July 19, 2006.  Dr. Abraham noted there was no clinical change.  Gillies reported that she could not tolerate Effexor because it made her irritable and easily agitated.  She complained of significant insomnia.  Dr. Abraham noted

---

[4]  A GAF score between 51 and 60 is defined as: "Moderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers)."  *Synopsis of Psychiatry* at 299.

that Gillies' response was poor. She discontinued Effexor, and prescribed Prozac, Abilify, and Deplin (increases effectiveness of antidepressants). R. 302, 303.

On July 25, 2006, Gillies saw Dr. Parikh for individual psychotherapy. She relayed a long history of depression that had not been formally treated very well and anxiety. She reported she was experiencing considerable depression, sleep disturbance, mood disturbance, anhedonia (inability to experience pleasure), and low self-esteem. Dr. Parikh noted that Gillies was anxious throughout the interview, and appeared to have symptoms of anxiety, "particularly panic." R. 301. He recommended weekly individual sessions. *Id.*

Gillies returned to Dr. Parikh for weekly therapy sessions throughout August 2006. Dr. Parikh noted each week that Gillies presented with an anxious or dysphoric mood and affect. R. 299-300. On August 26, 2006, Gillies reported she had attempted to be "less 'rude' in interpersonal interactions, but struggles with it." R. 299.

On August 3, 2006, Dr. Abraham discontinued Abilify and prescribed Depakote. R. 302. Gillies saw Dr. Abraham on August 16, 2006. Dr. Abraham noted that Gillies was non-compliant with Depakote. Gillies' memory was intact and she had no suicidal thoughts or panic attacks. She was sleeping poorly. Dr. Abraham's impression included panic disorder and borderline personality disorder. She indicated that Gillies' response was poor but her progress was improving. She continued to treat Gillies with medication. R. 298, 302.

Gillies returned to Dr. Abraham on August 30, 2006. Gillies reported she still had depression and symptoms of bulimia. She had thoughts of wanting to cut her wrists. Dr. Abraham's impression was bulimia, panic disorder, and personality disorder. She prescribed Geodone (antipsychotic). R. 297.

On September 11, 2006, Deborah Carter, Ph.D., completed a mental RFC assessment and psychiatric review technique form after reviewing Gillies' records. R. 277-94. Dr. Carter determined that Gillies had major depression, recurrent, a panic disorder with agoraphobia, bulimia, and a borderline personality disorder. R. 284-88. The mental impairments would result in mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. R. 291.

More specifically, Dr. Carter opined that Gillies would be moderately limited in the ability to do the following: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 277-78. Dr. Carter also opined that Gillies would be moderately limited in the ability to interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 278. Nevertheless, Dr. Carter noted that Gillies could understand, remember, and carry out routine instructions, make basic decisions, and concentrate to complete tasks and routine activities. She also retained the capacity to function mentally and socially to perform daily living activities and to interact appropriately with others. R. 279.

On September 19, 2006, Gillies returned to Dr. Abraham. Dr. Abraham noted there was no clinical change. Gillies reported having impulses to hurt herself, and either not sleeping or sleeping all the time. Dr. Abraham's impression was borderline personality disorder and panic disorder. She indicated Gillies' response was poor and there was no

change in her progress. She continued Gillies' medications and prescribed Seroquel. R. 296.

Gillies returned to Dr. Abraham on October 19, 2006. She stated she did not sleep well with Seroquel. She reported having panic attacks and being confined to her apartment. Dr. Abraham noted Gillies was preoccupied with traumatic memories. She indicated that Gillies' response was fair and her progress was improving. R. 295.

On March 6, 2007, Pamela D. Green, Ph.D., completed a mental RFC assessment and psychiatric review technique form after reviewing Gillies' records. R. 308-25. Dr. Green determined that Gillies had major depressive disorder (MDD), recurrent, panic disorder without agoraphobia, an eating disorder, and borderline personality disorder. R. 315, 317-19. She concluded that Gillies would have mild restriction of daily living activities, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. R. 322.

More specifically, Dr. Green opined that Gillies would be moderately limited in the ability to do the following: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 308-09. Dr. Green also opined that Gillies would be moderately limited in the ability to interact appropriately with the general public, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Nevertheless, she could understand simple, routine data,

albeit with reduced concentration, persistence, and pace, and had social and functional skills. R. 309.

On April 4, 2007, Gillies saw Louise I. Buhrmann, M.D. She reported that Dr. Abraham stopped seeing her because she stopped taking her medications. She stated she had a roommate because she was terrified to be alone. Her mood always changed, but Prozac helped. She had anxiety. She used to cut her arms which she started doing four years ago when she was upset at work. She binged and purged about four times a week, sometimes three times per day. She gained fifteen pounds in one month after stopping her medications. She was irritable and agitated, and did not sleep. She wanted to stay in bed. R. 329.

Dr. Buhrmann noted that Gillies appeared unkempt. She was attentive, her concentration appeared normal, and she seemed to have no memory problems. Gillies' affect seemed appropriate but irritable, and her mood was depressed. Her thought content was appropriate to mood. She suffered from hallucinations when in isolation. Her fund of knowledge and intelligence were average. Her judgment was fair, and her insight was good. Dr. Buhrmann diagnosed Gillies with major depression and bulimia. R. 330-31. She prescribed Prozac for depression, Lunesta for sleep, and Klonopin for anxiety. R. 332.

Gillies returned to Dr. Buhrmann on April 26, 2007. Gillies reported she was not sleeping well. She cried a lot, was easily frustrated, and felt hopeless, empty, worthless, and shameful. She felt like cutting herself but did not do it. She was binging and purging less, twice a week instead of four or five times a week. She had not been able to work or go to

school since her arrest. She liked to garden and enjoyed shoplifting. She hated stress. She no longer exercised because she got chest pains when she did anything. R. 333.

Gillies saw Dr. Buhrmann on May 29, 2007. She reported she stayed inside because she feared people and feared her own response if someone was mean to her. She felt alone. Dr. Buhrmann noted Gillies looked mildly agitated. R. 333. On June 28, 2007, Gillies told Dr. Buhrmann she was still very anxious, and it was hard to be around others. R. 334.

On August 13, 2007, Gillies reported to Dr. Buhrmann that she was not purging. Dr. Buhrmann noted she looked better and sounded more confident. *Id.* On September 19, 2007, Gillies told Dr. Buhrmann that she purged the last two weeks. She was shaky after being off Xanax for three days. *Id.*

On December 13, 2007, Gillies saw Dr. Buhrmann and reported she was arrested for shoplifting. She received her medications in jail. She was on probation. R. 335.

On January 3, 2008, Gillies had a telephone appointment with Dr. Buhrmann. She reported she had not had any medication for a week and was trying to get by without it. Dr. Buhrmann noted Gillies sounded medicated. R. 336.

On March 3, 2008, Gillies returned to Dr. Buhrmann. She reported she was not binging and purging, and that Prozac helped. She was active. She was eating three times a day and gained weight, the "fattest she has been." She felt frustrated and desperate. R. 337.

Gillies saw Dr. Buhrmann again on March 31, 2008. She stated she was eating better and was not binging or purging. She avoided people, and hardly went out. She had no

motivation to exercise.  She cleaned her daughter's house once a week.  She was sad and irritable, and thought about using cocaine to lose weight.  R. 338; *see also* R. 67.

On May 20, 2008, Gillies told Dr. Buhrmann she was sad and depressed.  R. 339. On July 3, 2008, Gillies reported she had been mugged at a gas station a month ago.  She felt helpless and stayed in her house since the incident.  She stopped taking Depakote.  She had nightmares less often.  *Id.*

On September 5, 2008, Dr. Buhrmann completed a Questionnaire as to Mental Residual Functional Capacity.  Dr. Buhrmann opined that Gillies would have moderate impairments in her ability to accept instruction from or respond appropriately to criticism from supervisors or superiors; work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; and perform at production levels expected by most employers.  R. 344-45.  She opined that Gillies would also have moderate impairments in her ability to respond appropriately to changes in work setting, and maintain personal appearance and hygiene.  R. 345.

Dr. Buhrmann opined that Gillies would have mild impairments in her ability to remember locations, workday procedures, and instructions; and to be aware of normal hazards and take necessary precautions.  *Id.*  She opined that Gillies would have marked impairments in her ability to behave predictably, reliably, and in an emotional stable manner; and to tolerate customary work pressures.  *Id.*  She concluded that Gillies' work condition would be likely to deteriorate if she was placed under stress, particularly that of a job, because she had cut herself under job pressure in the past.  *Id.*

Dr. Buhrmann also completed a Medical Source Assessment (Mental) form on September 5, 2008. R. 346-48. She opined that Gillies was able to travel in unfamiliar places or use public transportation with no observable limits. R. 347. She opined that Gillies would be able to perform the following tasks or functions, but with noticeable difficulty or distraction up to 10% of the workday or workweek: remember locations and work-life procedures; understand, remember, and carry out very short, simple instructions; understand and remember detailed instructions; perform activities within a schedule; be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. R. 346-47.

Dr. Buhrmann opined that Gillies would be able to perform the following tasks or functions, but with noticeable difficulty or distraction 11% to 20% of the workday or workweek: carry out detailed instructions; maintain attention and concentration for extended periods of time; maintain regular attendance; sustain ordinary routine without special supervision; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. *Id.*

Dr. Buhrmann opined that Gillies would be able to perform the following tasks or functions, but with noticeable difficulty or distraction more than 20% of the workday or workweek: complete a normal workday and workweek without interruptions from

psychological based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. R. 347. She elaborated that Gillies had mood swings, would have difficulty getting out of bed at times due to depression, had difficulty dealing with people (got irritated), and had "detonated when working before." R. 348.

In a letter dated December 5, 2008, submitted to the Appeals Council, Dr. Buhrmann indicated that Gillies suffered from "extreme symptomatology in the following areas: behavioral extremes, responding to others, being socially appropriate, working at a consistent pace, cooperation with others, using appropriate judgment, completing tasks independently, maintaining attention, maintaining productive levels in a job, responding to changes in a work setting, behaving predictably, reliably and in an emotional stable manner, maintaining personal appearance, and tolerating work pressures." R. 9.

C.    *Vocational Expert Testimony.*

At the hearing, the ALJ posed the following hypothetical question to the VE:

> Assume a hypothetical person of the claimant's age, her education and work experience who is able . . . due to her mental impairments . . . to understand, remember, carry out simple one or two-step routine instructions and procedures. She's able to make basic decisions. Basic meaning one or two-step decisions. She's able to concentrate to complete things that she starts. She's able to cope with routine activities. Routine being one or two-step activities, but ability to handle more than routine change or stress appears limited and therefore she is only to be put in a job where it has few if any workplace changes. Can such an individual with these limitations perform claimant's past work as she performed it or as customarily performed?

R. 74.  Based on this hypothetical question, the VE opined that the hypothetical claimant could not perform Gillies' past relevant work because of the simple one or two-step instructions.  *Id.*  The VE testified that the hypothetical claimant could perform work as a cashier II or a folder (unskilled, light work positions).  R. 75.

The ALJ then posed the following hypothetical question to the VE:

> [A]ssume a hypothetical person of claimant's age, education and work experience who is due to her mental impairments able to understand, remember, and carry out short and simple one or two-step instructions.  This individual is to work in an environment free of fast pa[ced] production requirements involving only simple one or two-step work related decisions with few if any workplace changes.  In addition, due to her anxiety of being around people and in the public in general this individual is to . . . work in an isolated environment with only occasional supervision.  She can work around coworkers throughout the day but with only occasional interaction with the coworkers.  So no engagement with the public.  She could be around coworkers but not engaged with them, and only have occasional interaction with them and only occasional supervision. . . .  Are there in your opinion other jobs in the regional or national economy that such a hypothetical person could perform?

R. 76.  The VE testified that the hypothetical claimant could perform the folder job or work as a golf range attendant (an unskilled, medium work position).  *Id.*

The ALJ then posed the following hypothetical question to the VE:

> Assume a hypothetical person the claimant's age, education, and work experience who is based on her testimony and the overall record that due to her severe mental impairments, especially her anxiety, this individual cannot sustain sufficient concentration, persistence . . . or pace to do even simple, one or two-step routine tasks on a regular and continuing basis for an eight-hour day, five days a week for a 40-hour workweek or an equivalent work schedule.  Assuming these vocational functions and limitations are there in your opinion other jobs in the regional or national economy that such a hypothetical person could perform?

R. 77. The VE testified that "if the person cannot perform even simple jobs there are no jobs to be available for that kind of person." *Id.*

In response to questions by Gillies' attorney, the VE testified that employers would not tolerate more than one absence each three or four months. R. 77. Further, breaks would be limited to ten to fifteen minutes in the morning and afternoon, and thirty to sixty minutes for a mid-day lunch. R. 78.

## V. ANALYSIS.

Gillies asserts two grounds supporting reversal. She contends that substantial evidence does not support the ALJ's conclusions regarding her ability to function in light of her mental impairments. She also contends that the ALJ failed to include all of her functional limitations in his hypothetical questions to the VE. These are the only issues I will address.[5]

A.     *Functional Limitations and Gillies' Credibility.*

In evaluating the functional limitations arising from pain and other subjective symptoms, an ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928.

In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard:"

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the

[5]  The parties were advised that issues not specifically raised would be waived. Doc. No. 11 at 2.

alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560-61 (11th Cir. 1995) (per curiam) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam)).

When an ALJ decides not to credit a claimant's testimony about pain and other subjective symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (per curiam) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1562; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

In the present case, the ALJ found that Gillies' "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." R. 19. The issue Gillies raises in this assignment of error, at its essence, is whether there is substantial evidence in the record to support the ALJ's conclusion that Gillies exaggerated her functional limitations. I will address Gillies' concerns by functional abilities.

1.    <u>Ability to Work With and Around Others.</u>

The ALJ found that Gillies' testimony about limitations in her social functioning was "inconsistent and contradictory at times." R. 31.  While Gillies testified her anxiety disorder kept her at home because she was afraid to go out in public, she testified that she went to the public library during slow times, she could go shopping at a mall, where she was arrested for shoplifting, and her roommate described her "activities of daily living as active" in Exhibit 11E.  R. 31.

Some of the facts cited by the ALJ in reaching this conclusion are supported by the record.  Gillies was able to go to the library, albeit only at slow times with headphones to distract her from other patrons.  She was able to shop for groceries and household supplies, and she admitted also going out to conduct shoplifting.

There is, however, no statement by Gillies' roommate in Exhibit 11E that Gillies' activities of daily living were active.  Rather, the roommate wrote as follows: "She spends most of her time watching TV or going on the computer and eating.  She usually stays in and only goes out when necessary.  Otherwise, her day includes grooming, taking care of the pets, and household chores." R. 212.  He also noted that Gillies' condition made "her sleep so she usually spends too much time in bed."  R. 213.  Finally, he observed that Gillies "hardly ever goes out anymore." R. 217.  The mischaracterization of the roommate's written statements raises concerns that the ALJ considered only those facts which support his conclusion, not the record as a whole.

2.    Ability to Concentrate.

Gillies argues that the ALJ did not cite substantial evidence in the record supporting his finding that she had sufficient ability to concentrate and work a normal workday and workweek without psychologically based symptoms.

In support of the finding regarding ability to concentrate, the ALJ adopted the opinions of Drs. Abraham and Buhrmann and the reviewing physicians, who found that Gillies could concentrate sufficiently to perform simple tasks and make basic decisions.  R. 31-32.

Substantial evidence in the record supports the finding that Gillies could maintain sufficient concentration to perform simple tasks and make basic decisions.  Dr. Carter, a reviewing physician, indicated that Gillies could understand, remember, and carry out routine instructions, make basic decisions, and concentrate to complete tasks and routine activities.  R. 279.  Dr. Green, another reviewing physician, indicated that Gillies could understand simple, routine data, albeit with reduced concentration, persistence, and pace.  R. 309.  The only time Dr. Abraham specifically commented on Gillies' ability to concentrate, she noted that Gillies' attention and concentration were good.  R. 305.  Finally, Dr. Buhrmann opined that Gillies would have only moderate impairments in performing at production levels expected by most employers, which, by her definition, would not preclude the ability to function in a work setting.  R. 344-45.

3.    Ability To Complete Normal Workday and Workweek.

The ALJ stated that "Dr. Bu[h]rmann's opinion that the claimant would have noticeable difficulty completing a normal workday due to psychological based symptoms is adequately addressed by the residual functional capacity, which limits her work-stress, requirements for

concentration and pace, and limits her interaction with others." R. 32. The ALJ's conclusion that Gillies could complete a normal work day if the job limited work stress, requirements for concentration and pace, and limited her interaction with others is not supported by substantial evidence.

Dr. Carter and Dr. Green opined that Gillies would have only moderate limitations in the ability to complete a normal workday and workweek without interruptions due to psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 278, 309. Dr. Buhrmann, a treating physician, opined that Gillies would have marked limitations in her ability to behave predictably and reliably in the work place, and noted that Gillies' condition would be likely to deteriorate under work stress. R. 345. The ALJ determined that this functional limitation would be relieved by a job with no work stress.

However, Dr. Buhrmann also opined that Gillies would be unable to complete a normal workday or workweek without interruptions from psychologically based symptoms more than 20% of each workday or workweek, due, in part, because Gillies "[h]as mood swings" and "[w]ill have difficulty getting out of bed at times due to depression." R. 348. The inability to complete a normal workday or workweek due to depression and anxiety is consistent with Gilles' testimony and the written statement by Gilles' roommate indicating that she spent too much time in bed and was irritable. *See, e.g.*, R. 58, 213, 218. Dr. Buhrmann's treatment notes also disclose Gillies' mood swings. *See* R. 329, 338.

Notably, both Dr. Carter and Dr. Green's mental RFC assessments were made before Gillies began treatment with Dr. Buhrmann. Therefore, neither of these reviewing physicians

had the opportunity to assess Dr. Buhrmann's records in rendering their opinions. Under these circumstances, it was particularly incumbent upon the ALJ to expressly address why he did not give controlling weight to Dr. Buhrmann's opinion as a treating physician regarding the mental functional limitations on Gillies' ability to complete a normal workday or workweek. *See, e.g., Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (substantial weight must be given to opinion of treating physician unless there is good cause to do otherwise).

The ALJ did not articulate specific and adequate reasons for not crediting the opinion of Dr. Buhrmann, a treating physician, regarding Gillies' impairment in the ability to complete a normal workday and workweek. There are also gaps in the ALJ's analysis of the record as a whole regarding Gillies' ability to work with and around others, as discussed above. Under these circumstances, reversal of the Commissioner's decision is warranted.

B.     *Hypothetical Question to the VE.*

"In order for a vocational expert's testimony to constitute substantial evidence the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The ALJ was only required, however, to state the functional limitations arising from these mental impairments in his hypothetical questions, not the mental impairments themselves. *See Oates v. Astrue*, No. CA 08-0478-CG-C, 2009 WL 1154133, at *4 (S.D. Ala. Apr. 27, 2009).

Gillies argues that the ALJ erred in relying on the VE's testimony based on a hypothetical question that failed to include Gillies' moderate limitations in her ability to concentrate and to complete a normal workday and workweek. If the Court finds, as

discussed above, that the ALJ did not properly assess Gillies' functional limitations, then there is an insufficient basis to determine whether the hypothetical questions to the VE included all of Gillies' limitations based on a properly derived RFC.

If, however, the Court finds that substantial evidence supports the ALJ's RFC determination, then the second hypothetical question to the VE included all of the functional limitations in the RFC. The ALJ included in his second question to the VE the limitations that Gillies could only understand, remember, and carry out short and simple one- or two-step instructions, and work in an environment free of fast-paced production requirements involving only simple one- or two-step work related decisions with few, if any, workplace changes. R. 76. Based on this hypothetical question, the VE opined that the person could perform the jobs of folder or golf range attendant.

C.    Remand for an Award of Benefits.

Gillies requests that the Court remand the case for an award of benefits. A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993); accord Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997).

Because the ALJ's credibility finding was not supported by substantial evidence, a proper RFC assessment has not been made. Therefore, disability has not been established without doubt. Accordingly, remand is required for the Commissioner to reassess Gillies' testimony about her subjective symptoms and the limitations arising therefrom. Due to Gillies' nonexertional impairments, on remand the ALJ should again call upon the service of

a VE to assist in determining whether there was work Gillies could perform in light of her nonexertional impairments.

## VI.   RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and the case be **REMANDED** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  It is further recommended that after the Court issues its ruling on this Report and Recommendation, it direct the Clerk of Court to issue a judgment and close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on May 12, 2010.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy